JUDGE KAPLAN

# 08 CV 1724

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

LYNETTE ROBINSON,

DOCKET NO.: _____

Plaintiff,

-against-

AMERICAN INTERNATIONAL GROUP, INC.,
ANTHONY DESTEFANO and
MATTHEW FRANKEL,

**COMPLAINT**

PLAINTIFF DEMANDS
TRIAL BY JURY

Defendants.

-------------------------------------x

Plaintiff, LYNETTE ROBINSON ("Plaintiff" or "ROBINSON"), by her attorney, LAW

OFFICE OF VINCENT I. EKE-NWEKE, P.C., as for her Complaint, against the Defendants

AMERICAN INTERNATIONAL GROUP, INC., ("AIG"), ANTHONY DESTEFANO

("DESTEFANO"), and MATTHEW FRANKEL ("FRANKEL") ("together Defendants"), alleges

upon information and belief, as follows:

## I.    NATURE OF THE ACTION

1.    ROBINSON brings this action to recover damages and for equitable relief pursuant

to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1001 *et seq.*, and particularly, 29 U.S.C. §§ 1025(a), 1132(c) and 1140, to remedy her unlawful

discharge, which was done pretextually and with the purpose of interfering with a right to which

ROBINSON and/or her designated beneficiaries were entitled to under AIG's Life Insurance Plan,

including the Supplemental Group Life Insurance Plan ("SGLIP").

2.    Also, ROBINSON brings this action to remedy discrimination on the basis of

disability and race in the terms, conditions, and privileges of employment in violation of the Civil

Rights Act of 1866, 42 U.S.C. § 1981 (§ 1981), the New York State Human Rights Law, Executive

Law § 290 *et seq.* (Human Rights Law) and the Administrative Code of the City of New York, § 8-101 *et seq.* (City Law).

3.    In addition, ROBINSON claims that, in violation of all those laws, Defendants retaliated against her for having complained about Defendants' unlawful and discriminatory acts towards her. ROBINSON further claims that AIG breached its obligations and the implied covenant of good faith and fair dealing under the Life Insurance Plan, including the SGLIP, in violation of the Common Law of the State of New York.

4.    ROBINSON seeks monetary relief, including back pay, front pay, compensatory and punitive damages, attorney's fees and costs of the action, injunctive relief consisting of an order requiring AIG to reinstate ROBINSON to her position, declaratory and other appropriate legal and equitable relief pursuant to ERISA, § 1981, the Human Rights Law, the City Law, and the Common Law of the State of New York.

## II.    JURISDICTION AND VENUE

5.    Jurisdiction of the subject matter of this action is established in this court by 29 U.S.C. §1132, 28 U.S.C. §§ 1331 and 1343(a)4, and§ 1981.

6.    All causes of action not relying exclusively on the aforementioned federal causes of action as a basis of this court's jurisdiction, are based on the court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, to hear related state law causes of action.  The events, parties, transactions, and injuries that form the basis of ROBINSON'S federal claim are identical to the events, parties, transactions, and injuries that form the basis of ROBINSON'S claims brought under the Human Rights Law, the City Law and Common Law.

7.    As the unlawful employment practices complained of herein occurred within the

Southern District of New York and Defendants regularly do business within this District, venue is

proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

## III.   SATISFACTION OF PROCEDURAL PREREQUISITES FOR SUIT

8.    Pursuant to § 8-502 of the City Law, prior to filing the Complaint in this action with

the Court, a copy thereof was served on the City of New York Corporation Counsel and the New

York City Commission on Human Rights.

## IV.   THE PARTIES

9.    ROBINSON is 61 years of age and a Black Female.    At all relevant times,

ROBINSON was a "participant" in AIG's employee welfare benefit plan as defined by 29 U.S.C.

§ 1002, including but not limited to the SGLIP.   ROBINSON was an employee within the meaning

of ERISA, § 1981, the Human Rights Law and the City Law.

10.    AIG is a corporation organized and existing under the laws of the State of Delaware

with its principal office and place of business located in Manhattan, State of New York.  AIG is an

employer engaged in industry or activity affecting commerce and is both the plan sponsor and plan

administrator of the SGLIP for employees of AIG and its member companies, subsidiaries or

divisions.

11.    During all times herein mentioned, Defendant DESTEFANO, a Caucasian Male, was

and still is, an adult person and an employee, servant, agent, representative and/or a senior executive

in charge of the Human Resources Department of AIG's member companies, subsidiaries or

divisions known as American Home Assurance Company ("American Home") and National Union

Fire Insurance Company of Pittsburgh, Pa. ("National Union").

3

12. During all times herein mentioned, American Home and National Union were and still are among the principal units of AIG's Domestic Brokerage Group ("DBG").

13. During all times herein mentioned, Defendant FRANKEL, a Caucasian Male, was and still is, an adult person and an employee, servant, agent, representative and/or President of the American Home's AIG Warranty division.

14. Defendants are employers within the meaning of § 1981, the Human Rights Law and the City Law, and were in virtue of the aforementioned laws, prohibited from discriminating and/or retaliating in employment decisions on the basis of disability and race. ROBINSON was in virtue of said laws protected against discrimination and retaliation in employment on the basis of disability and race.

## V. FACTUAL ALLEGATIONS

15. ROBINSON was employed by Defendant AIG on or about June 29, 1990, as an Executive Assistant (then known as Executive Secretary) and was continuously employed by AIG at various locations in Manhattan, New York, from June 1990, until November 16, 2007, when she was unlawfully discharged by Defendants pretextually with the purpose of interfering with a right to which ROBINSON and/or her designated beneficiaries were entitled to under the SGLIP and also because of her disability and race.

16. Prior to the time she began her employment with AIG, ROBINSON possessed superior educational qualification and had several years of experience in employment positions that required her to apply her administrative and/or managerial skills, acumen or knowledge.

4

17.    Specifically, ROBINSON obtained a B.S. Degree in Business Administration in 1980 from Baruch College, New York, New York and an A.A.S. Degree in Secretarial Science in 1975, from New York City Technical College. At various times, ROBINSON was employed in administrative positions at ITT Corporation, Fiduciary Trust Bank, Mobil Oil Corporation and New York City Board of Education, through Crown Business School.

18.    During her over 17 years tenure with AIG, ROBINSON was variously assigned to and worked for several AIG executives as their executive assistant. Such executives include, Howard Smith, AIG Chief Financial Officer, Joe Cavalo, AIG/AIGRM Chief Financial Officer and Regional Manager, Norman Sorrenson, Senior Executive AIG/AIU, John Johnson, Vice President of Marketing for New York Region, Vincent Masucci, Senior Executive Vice President for AIG/DBG Regional OPS, David Hupp, Senior Executive Vice President for AIG/DBG, Joe Palumbo, Director of Commercial/Small Business Accounts for DBG Marketing Nationwide and Christopher Maleno ("Maleno"), who held different positions and titles including, Regional Vice President for New York Region/Zonal Executive Vice President for the New York Region, Executive Vice President and President of American Home's AIG Excess Casualty division.

19.    As demonstrated by the excellent job performance evaluations issued to ROBINSON over the years by AIG, her job performance throughout the more than 17 years of her employment was consistently excellent. ROBINSON received glowing commendations from different AIG executives she worked for over the years and was recognized for her excellent work, dedication and administrative or managerial ability.

5

20.    ROBINSON was Maleno's Executive Assistant for approximately eight (8) years and as a key member of Maleno's team was instrumental for so many of his accomplishments and achievements. At some point during this period, Maleno was AIG's Regional Vice President, as well as the Zonal Executive Vice President for the New York Region and was heralded as the first person in AIG to achieve $1 Billion Dollars in sales for the region.

21.    In or about 2003, when AIG had noncompliance problems with federal regulatory authorities, Maleno (with ROBINSON as his Executive Assistant), was assigned to AIG's American Home to "clean up the mess." Again, ROBINSON was instrumental for the excellent work Maleno was credited with in cleaning up the "noncompliance mess".

22.    With ROBINSON as his Executive Assistant, Maleno eventually held the titles of Chief Operating Officer for American Home,  Executive Vice President and later, President of American Home's AIG Excess Casualty division.

23.    Despite ROBINSON'S superior qualification, excellent job performance, hard work and over 17 years dedication to AIG's work, on or about November 16, 2007, Defendants unlawfully discriminated, retaliated and/or discharged ROBINSON for the purpose of interfering with a right to which ROBINSON was entitled to under AIG's SGLIP, intentionally discriminated against ROBINSON on the basis of her disability and race and retaliated against her for her complaints against discrimination.

24.    AIG has maintained and does maintain various employee benefit plans, including but not limited, to the SGLIP which provides a participating employee a Supplemental Group Life Insurance Coverage ("Coverage") equal to the the employee's annual base salary rounded up to the highest $1,000.00.

6

25.    The provisions of the SGLIP among other things, allow a participating employee to purchase Coverage in the amount equal to one, two, three, or four times his or her annual salary rounded up to the next highest $1,000.00 to a maximum coverage of $1,000,000.00. Also, the SGLIP requires a participating employee to pay for the Coverage through payroll deductions made by AIG from such employee's salary.

26.    ROBINSON enrolled in the SGLIP not long after she began her employment with AIG. Following her said enrollment, AIG consistently made bi-weekly payroll deductions from ROBINSON'S salary to cover the alleged cost of the Coverage.

27.    In or about the June 2007, ROBINSON discovered that the amount of the bi-weekly payroll deduction AIG made from her salary for the alleged cost of the Coverage had almost doubled from approximately $45.00 to over $80.00.

28.    As a result of this discovery, ROBINSON began to ask several AIG employees and managers for an explanation as to why said bi-weekly deduction increased almost two-fold. Among other things, ROBINSON requested AIG to provide her with coverage description of the Coverage, information and documents about conversion or rollover of the Coverage to an individual Life Insurance, information and documents explaining the basis of said increase in the amount of the bi-weekly deductions, and information and documents about the procedure for requesting a lower Coverage limit and reduction of the amount of said bi-weekly deduction.

29.    In the same June 2007, ROBINSON contacted Kathleen Mahony ("Mahony"), Caucasian Female and the Human Resources Manager for American Home, with respect to said increase in the bi-weekly deductions. After giving ROBINSON a lot of "run-around" without any explanation for the increase and without providing ROBINSON with any of the information or

documents she requested, as alleged in paragraph 28 above, Mahony referred ROBINSON to Maria

Rountos ("Rountos"), Caucasian Female and Human Resources Assistant Manager for American

Home.

30.     Although requested by ROBINSON, Rountos failed to explain to ROBINSON the

reason for said increase in the bi-weekly payroll deductions, nor provide ROBINSON with any of

the information or documents she requested, as alleged in paragraph 28 above.  In order to reduce

the amount of the bi-weekly deductions for the Coverage, in or about July 2007, ROBINSON

requested Rountos to lower or reduce the Coverage limit from two times ROBINSON'S annual

salary to an amount equal her annual salary.

31.     In response to ROBINSON'S said request, Rountos stated as follows to ROBINSON:

a.      that the Coverage limit can not be lowered or reduced;

b.      that the amount of the bi-weekly payroll deductions cannot be lowered or reduced;

c.      that ROBINSON'S only options were to (i) terminate the Coverage, or (ii) maintain

        both the Coverage limit and amount of payroll deductions "as is";

d.      that if ROBINSON terminates the Coverage, she would lose all the money she had

        paid for the Coverage over the years and would not be able to convert or rollover the

        Coverage to an individual policy.

32.     At this time, as set forth below in paragraphs 60 through 66 of this Complaint,

Defendants were also discriminating, harassing and retaliating against ROBINSON on account of

her disability and complaints of discrimination.

8

33. Following numerous phone calls and inquiries on the issue of the Coverage, ROBINSON was referred to Nancy Pearlstein, ("Pearlstein"), Caucasian Female and a Group Benefits Supervisor assigned to AIG's Employee Benefits Department. Again, ROBINSON was "given a run-around" by Pearlstein's office until she was able to speak to Pearlstein.

34. In or about July, 2007, Pearlstein informed ROBINSON that the information Rountos provided to ROBINSON about the Coverage as alleged above in paragraph 31 (a) to (d) of this Complaint, was false. Pearlstein further informed ROBINSON that she (ROBINSON) is free to lower the Coverage limit to an amount equal to her annual salary and thereby lower the amount of the bi-weekly payroll deductions.

35. Pearlstein then provided ROBINSON with a form which she said ROBINSON needed to complete and submit to the Human Resources department of American Home, in order to have the Coverage limit and the bi-weekly payroll deductions lowered. ROBINSON completed the form and submitted it to Mahony. Mahony accepted the form and informed ROBINSON that she would give the form to Rountos to process.

36. Unbeknown to ROBINSON, Mahony, Rountos, DESTAFANO and/or American Home Human Resources failed to process her application to lower the Coverage limit. Also, AIG did not lower amount of said bi-weekly deductions nor provide ROBINSON with the information or documents she requested as alleged above in paragraph 28 of this Complaint.

37. Meanwhile, Mahony ceased to work for American Home. When next ROBINSON contacted Rountos about the Coverage, Rountos again, deliberately misled ROBINSON by informing her that she (ROBINSON) is required to complete and submit Evidence of Insurability form before her application to lower the Coverage limit could be processed.

38.     Contrary to Rountos' representation, on September 10, 2007, Pearlstein informed ROBINSON that no evidence of insurability is required in order to lower the Coverage limit. Also, Pearlston referred ROBINSON to a Dianne Rotondo ("Rotondo") for information about conversion or rollover of the Coverage to an individual policy.

39.     Although ROBINSON began in June 2007 to request AIG to lower the Coverage limit and the amount of said bi-weekly payroll deductions and to provide her with information and documents as alleged above in paragraph 28 of this Complaint, AIG failed and/or refused to comply with any of the requests.

40.     Without complying with any of the requests, on November 16, 2007, AIG discharged ROBINSON from its employment on the pretextual ground that ROBINSON failed to cover the reception desk. In actual fact, AIG discharged ROBINSON for the purpose of interfering with a right to which ROBINSON was entitled to under AIG's SGLIP, and as alleged below in paragraphs 60 through 66 of this Complaint, on the basis of her disability and race and in retaliation for her complaints against discrimination. At the time of her discharge, ROBINSON'S annual salary was approximately $69,500.00.

41.     Within 15 days after her discharge by AIG, ROBINSON contacted Rotondo with respect to the conversion or rollover of the Coverage and her Basic Group Life Insurance coverage, Rotondo repeatedly informed ROBINSON that both coverages had lapsed and could no longer be converted or rolled over because, according to Rotondo, her (Rotondo's) records show that ROBINSON was discharged on September 11, 2007, and that ROBINSON was required to make the request for conversion within 31 days of September 11, 2007.

10

42.    AIG follows a policy or practice that favors its Caucasian employees and discriminates and/or has a discriminatory effect on ROBINSON and Black employees in general, on the basis of their race. Such discriminatory policy or practice has been and is being implemented by AIG in the DBG, particularly, in American Home, in the following manner: by failing to establish a salary grade or scale for the executive assistant position and other positions, by failing to establish, adopt, set or follow any objective standard or criteria in determining the amount of salary, salary increase and bonus awarded to Executive Assistants, by failing to promote or hire Black employees into executive assistant and/or senior administrative positions, by promoting, hiring or appointing only Caucasians to executive and/or management positions. This discriminatory policy or practice has a disparate impact on ROBINSON'S civil rights and equal opportunity based on ROBINSON'S race.

43.    For several years prior to the termination of ROBINSON'S employment, notwithstanding that ROBINSON was saddled with substantially more and/or difficult job responsibilities than similarly situated Caucasian Executive Assistants assigned to the DBG, AIG paid or gave such Caucasian Executive Assistants higher amounts of salary and/or salary increases than it paid to ROBINSON and other Black Executive Assistants.

44.    Such Caucasian Executive Assistants were also given and/or awarded bonuses and other employment benefits whereas ROBINSON did not receive any bonus while assigned to American Home. The Caucasian Executive Assistants in question, include but are not limited to, Ann Ciaburri, Angela Haskel, Anne Reagan-Jaggassar, Sandy Nalewajk, Jeanette Serrano (recently promoted - was an Administrative Assistant), Annette Buccigrassi, Dana Rocco, Judith Seil, Stacy Puma, Jane Scarro, Christina Vilaneuva, Maryann Nennnom and Patricia Black.

11

45.     The discriminatory practice which exists in American Home, is in part fostered by the fact that all the core management and executive positions in American Home have been and are still held by Caucasians. For instance:

a.      Doyle, the President American Home is Caucasian.

b.      The President of each of the four (4) divisions within American Home is Caucasian:

i.      AIG Excess Casualty and AIG Specialty Excess - Timothy McAuliffe

ii.     AIG Specialty Workers' Compensation - Robert Purdy, and

iii.    AIG Warranty- FRANKEL.

c.      DESTAFANO, Caucasian, is the Senior Executive Officer in charge of the Human Resources Department of American Home and National Union.

d.      Kathleen Mahony, Maria Rountos and Jamie Zinn, all Caucasian, each was a Human Resources Manager or Assistant Manager for American Home.

e.      Patrick Burns, Caucasian, is the Chief Financial Officer of American Home.

f.      John Jones, Caucasian, is the Vice President of Communication/Marketing and Advertisement for American Home, National; Union and AIG/DBG.

g.      Rick Woollams, Caucasian, is the Executive Vice President for Claims for American Home and National Union

h.      Christine West, Caucasian, is the Chief Underwriting Officer for American Home.

i.      The only Black executives in American Home are Kevin Whitehead and Michael Smithers, were hired by Maleno in about 1999 and 2001 respectively.  Maleno later "paid a heavy price" promoting said Black executives.

12

46.    Similarly, each unit of the DBG is headed by a Caucasian. In fact, every member of

the so-called DBG Executive Diversity Council is Caucasian. Such members include:

a.    Joseph L. Boren, Chairman and CEO of AIG Environmental

b.    John Doyle, President of American Home and President and CEO of National Union

c.    Kenneth V. Harkins, Senior Vice President and General Counsel of Domestic

General Insurance

d.    Kevin H. Kelley, Chairman and CEO of Lexington Insurance Company

e.    W. Gordon Knight, President of DBG Sales & Marketing

f.    Gary E. Muoio, Senior Vice President, DBG Underwriting Operations & Systems

g.    Mary Ann Ross, Senior Vice President of Human Resources, Domestic General

Insurance

h.    Charles R. Schader, AIG Senior Vice President, Claims

i.    Robert S. Schimek, Senior Vice President and Chief Financial Officer of Domestic

General Insurance

j.    Douglas M. Worman, Senior Vice President and DBG Zonal Executive

47.    When ROBINSON and Maleno were assigned to American Home in 2003, David

Perez, Caucasian Male, was the President of AIG Excess Casualty. At that time, Anne Ciaburri,

("Ciaburri") Caucasian Female, was Perez' Executive Assistant. Maleno and Charlie Abbruzzo

("Abruzzo"), AIG Executive Vice President were both second in command to Perez. Abbruzzo's

Executive Assistant was Annette Buccigrassi ("Buccigrassi") Caucasian Female.

48.    In or about 2005, AIG reassigned Perez together with Ciaburri from Excess Casualty to a different unit and promoted Maleno (with ROBINSON as his Executive Assistant), to President of Excess Casualty.

49.    Late in 2005, while ROBINSON was still Maleno's Executive Assistant, AIG, by and through Kevin McDermott ("McDermott") Caucasian Male, sought to modify ROBINSON'S job responsibilities by directing ROBINSON to start covering the reception desk for one to two hours as needed.

50.    At that time, the telephone console at the reception desk had over twelve (12) telephone lines which rang virtually nonstop. The receptionist desk in question received telephone calls for American Home (which among other divisions, comprised of AIG Excess Casualty, AIG Specialty Workers' Compensation AIG Warranty and AIG Specialty Excess) and National Union which then marketed AIG's Directors and officers, errors and omissions, employment practices and fiduciary liability insurance and services.

51.    ROBINSON is a person with a "disability" within the meaning of the Human Rights Law and City Law, in that she has a record of or is regarded as having a physical and/or mental impairment that substantially limits one or more of her major life activities, in that ROBINSON suffers from a physical disability, to wit: episodic vertigo, auditory imbalance, disequilibrium and/or labyrinthine dysfunction.

52.    ROBINSON explained to McDermott, Maleno and Mahony that because of her disability (auditory imbalance) she would not be able to cover the reception desk as the constant ringings of the telephones in her ears, even for less than ten (10) minutes, would cause her to suffer from episodic vertigo, including dizziness, head whirling, spinning, or tilting and prevent her from

14

sleeping. ROBINSON also reminded Mahony that Ciaburri was not required to cover the reception

desk when she worked for Perez as his Executive Assistant. Nonetheless, Mahony requested

ROBINSON to produce a "doctor's note" concerning her disability.

53.    Following ROBINSON'S request for a reasonable accommodation of her disability

and upon production of a "doctor's note" from her treating physician, Dione M. Williams, M.D.,

("Dr. Williams"), Otolaryngology, AIG made a reasonable accommodation of ROBINSON'S

disability by not requiring ROBINSON to cover the reception desk as had been planned.

54.    In about December 2006, Maleno abruptly ceased to work for AIG and was replaced

by Tim McAuliffe ("McAuliffe"), Caucasian Male, as the President of AIG Excess Casualty

division. Prior to the time he stopped working for AIG, Maleno had two assistants working for him --

ROBINSON his Executive Assistant and Gail LoPinto ("LoPinto"), Caucasian Female, his

Marketing Coordinator.

55.    Because ROBINSON was Maleno's Executive Assistant at the time he ceased to work

for AIG, pursuant to AIG's practice and procedure, ROBINSON ought to have been assigned to

work for McAuliffe (who replaced Maleno as President of Excess Casualty), as his Executive

Assistant.

56.    However, rather than assign ROBINSON to McAuliffe as his Executive Assistant,

Defendant DESTEFANO, in violation of AIG's policies, practices or procedures, discriminated

against ROBINSON on the basis of her race by assigning LoPinto to work for McAuliffe as his

Executive Assistant, notwithstanding that ROBINSON was better qualified and had more experience

in that position than LoPinto.

15

57.    Upon being denied the position of Executive Assistant to McAuliffe, ROBINSON was left without any job responsibilities, and was constrained to accept a position outside Excess Casualty, as the Executive Assistant to Defendant FRANKEL, who was then the President of American Home's AIG Warranty division.

58.    ROBINSON accepted the position as FRANKEL'S Executive Assistant partly because DESTEFANO had represented to ROBINSON that the position would be ideal for ROBINSON given her disability since FRANKEL received only a few telephone calls daily. It is important to note that FRANKEL had no Executive Assistant nor Secretary for at least seven (7) years prior to January 2007 when ROBINSON started working for him.

59.    With full knowledge of ROBINSON'S disability, in or about April 2007, FRANKEL together with Mahony, invited ROBINSON into FRANKEL'S office for a meeting and therein informed ROBINSON that her job responsibilities would be modified to include her coverage of the reception desk for two (2) hours daily.

60.    FRANKEL started the meeting by stating to ROBINSON "I am a team player and when I am asked to do something by John Doyle, I try to carry it out." Doyle, Caucasian Male, was then the President of American Home and National Union.

61.    ROBINSON reminded Mahony and FRANKEL about her disability and requested Mahony not to disturb or terminate the reasonable accommodation AIG had made for her disability in 2005. Mahony told ROBINSON not to worry, that she would not be made to cover the reception desk if she produces a "doctor's note" as she had done in 2005. Alternatively, ROBINSON proposed to Mahony to allow her (ROBINSON) cover the reception desk very early in the mornings before the telephones would start to ring incessantly.

16

62.    ROBINSON provided the "doctor's note" to Mahony and repeatedly complained to Mahony and DESTEFANO, that AIG's attempt to ignore her disability and/or terminate the existing reasonable accommodation it made for her in 2005 was discriminatory and a violation of anti disability discrimination laws.

63.    At the time ROBINSON made the aforesaid complaints of disability discrimination, she reasonably believed and still believes that AIG's conduct was discriminatory, unlawful and a violation of her rights.

64.    As a result of ROBINSON'S complaints of discrimination, in or about June 2007, AIG, by and through Mahony, DESTEFANO and FRANKEL, discriminated and/or retaliated against ROBINSON for making said complaints, among other things, by arranging for AIG's alleged Healthcare Reviewers to discuss ROBINSON'S disability and medical condition with Dr. Williams; by "compelling" ROBINSON to sign an authorization permitting Dr. Williams to disclose ROBINSON'S medical records or information to the alleged Healthcare Reviewers; by threatening to terminate ROBINSON'S employment if Dr. Williams fails to contact the Healthcare Reviewers by telephone; by procuring unfair job performance evaluation for ROBINSON; by failing to provide ROBINSON with information or documents pertaining to the Coverage in violation of ERISA; by changing the date ROBINSON began her employment with AIG from June 29, 1990 to a date in 1995, thereby negatively affecting and/or reducing the amount of ROBINSON'S expected pension and/or benefits; by knowingly engaging in, encouraging and/or condoning a course of conduct which included subjecting ROBINSON to a hostile work environment, unfair reprimands continual harassment, intimidation, verbal abuse and/or insults; and by subjecting ROBINSON to discriminatory terms conditions or privileges of employment.

17

65.     Defendants unlawfully discriminated, retaliated and discharged ROBINSON for the purpose of interfering with a right to which ROBINSON was entitled to under AIG'S SGLIP, by failing to comply with ROBINSON'S request for information mandated by ERISA; intentionally discriminated against ROBINSON on the basis of her disability and race and retaliated against her for complaining about disability discrimination, by subjecting her to discriminatory terms and conditions of employment; by terminating ROBINSON'S employment; by failing to make a reasonable accommodation for ROBINSON'S disability, even though ROBINSON had the ability to satisfactorily perform the essential functions of her job with reasonable accommodation and even though such reasonable accommodation would not have placed undue hardship on AIG.

66.     AIG was fully aware of the retaliatory and discriminatory conduct against ROBINSON and encouraged such conduct by failing to take any action to remedy the situation, even though ROBINSON made several complaints and attempted to meet with Doyle in connection therewith.

## FIRST CAUSE OF ACTION AGAINST DEFENDANTS
## DISCRIMINATION, RETALIATION AND INTERFERENCE WITH PROTECTED
## RIGHTS IN VIOLATION OF ERISA

67.     ROBINSON repeats and realleges each and every allegation contained in paragraphs 1 through 66 of this Complaint with the same force and effect as if set forth herein.

68.     By the acts and practices described herein, Defendants have purposefully interfered with ROBINSON'S right to convert the Coverages described herein and the benefits ROBINSON and/or her beneficiaries would have obtained under AIG's Life Insurance Plan in violation of ERISA.

69.    As a result of said Defendants' acts and practices, ROBINSON has suffered and will continue to suffer irreparable injury, loss of substantial retirement benefits, medical and life insurance benefits, salary or wage, bonus, stock purchase option, pension, retirement package, long term disability, personal accident insurance benefits, incentive savings and other monetary damages unless and until this Court grants relief.

## SECOND CAUSE OF ACTION AGAINST DEFENDANTS
## § 1981 DISCRIMINATION

70.    ROBINSON repeats and realleges each and every allegation contained in paragraphs 1 through 69 of this Complaint with the same force and effect as if set forth herein.

71.    By the acts and practices described herein, Defendants have discriminated against ROBINSON in the terms and conditions of her employment on the basis of her race in violation of § 1981.

72.    In taking the above-described discriminatory actions, Defendants acted with malice and/or reckless indifference to ROBINSON'S rights under § 1981.

73.    As a result of Defendants' discriminatory acts and practices, ROBINSON has suffered and will continue to suffer irreparable injury, loss of substantial retirement benefits, medical and life insurance benefits, salary or wages, bonus, stock purchase option, pension, retirement package, long term disability, personal accident insurance benefits, incentive savings, emotional distress, and other monetary damages unless and until this Court grants relief.

## THIRD CAUSE OF ACTION AGAINST DEFENDANTS
## HUMAN RIGHTS LAW AND CITY LAW DISCRIMINATION

74.    ROBINSON repeats and realleges each and every allegation in paragraphs 1 through 73 of this Complaint with the same force and effect as if set forth herein.

75.    By the acts and practices described herein, Defendants have discriminated against ROBINSON in the terms and conditions of her employment on the basis of her disability and race in violation of the Human Rights Law and the City Law.

76.    In taking the above-described discriminatory actions, Defendants acted with malice and/or reckless indifference to ROBINSON'S right under the Human Rights Law and the City Law.

77.    As a result of Defendants' discriminatory acts, ROBINSON has suffered and will continue to suffer irreparable injury, loss of substantial retirement benefits, medical and life insurance benefits, salary or wages, bonus, stock purchase option, pension, retirement package, long term disability, personal accident insurance benefits, incentive savings, emotional distress, and other monetary damages unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION AGAINST DEFENDANTS
## HUMAN RIGHTS LAW AND CITY LAW RETALIATION

78.    ROBINSON repeats and realleges each and every allegation contained in paragraph 1 through 77 of this Complaint with the same force and effect as if fully set forth herein.

79.    In retaliation for ROBINSON'S complaints about Defendants' discriminatory acts, Defendants adversely affected ROBINSON'S employment.

80.    In taking the above-described retaliatory actions, Defendants acted with malice and reckless indifference to ROBINSON'S rights under the Human Rights Law and the City Law.

81.    As a result of Defendants' retaliatory acts, ROBINSON has suffered and will continue to suffer irreparable injury, loss of substantial retirement benefits, medical and life insurance benefits, salary or wages, bonus, stock purchase option, pension, retirement package, long term disability, personal accident insurance benefits, incentive savings, emotional distress, and other monetary damages unless and until this Court grants relief.

82.    AIG breached its obligations and implied covenant of good faith and fair dealing with regard to ROBINSON by engaging in the unlawful acts and practices alleged herein, as a result ROBINSON has suffered damages.

## VI.  PRAYER FOR RELIEF

**WHEREFORE**, ROBINSON respectfully requests that this Court enter a judgment:

(a)    declaring that the acts and practices complained of herein are in violation of ERISA, § 1981, the Human Rights Law, the City Law and the Common Law of the State of New York;

(b)    enjoining and permanently restraining these violations of ERISA, § 1981, the Human Rights Law, and the City Law;

(c)    directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect her employment opportunities;

(d)    directing Defendants to make her whole for all earnings she would have received but for Defendants' unlawful conduct, including, but not limited to, wages, salary raises, pension, bonuses, retirement benefits, medical and life insurance benefits, stock purchase options, long term disability benefits, personal accident insurance benefits, incentive savings and other lost benefits;

21

(e)     directing Defendants to pay her an additional amount as compensatory damages for

her pain and suffering and emotional distress;

(g)     directing Defendants to pay her an additional amount as punitive damages for their

willful and/or reckless disregard for her statutory rights;

(h)     awarding her such interest as is allowed by law;

(i)     awarding her reasonable attorneys' fees and costs; and

(j)     granting other such and further relief as this Court deems necessary and proper.

## VII.   DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, ROBINSON demands

a trial by jury.

Dated:     Brooklyn, New York
           February _____, 2008

LAW OFFICE OF VINCENT I. EKE-NWEKE, P.C.

By: _____
      Vincent I. Eke-Nweke (VE 5282)
      Attorney for the Plaintiff
      498 Atlantic Avenue
      Brooklyn, New York 11217
      (718) 852-8300

22